23-1019-cv
*Jin v. City of New York*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2023

(Argued:  May 16, 2024   Decided: March 12, 2026)

No. 23-1019-cv

_____

GUO HUA JIN,

*Plaintiff-Appellee,*

— v. —

CITY OF NEW YORK, POLICE OFFICER ARIELLE GIGANTE, POLICE OFFICER JOHN DOE, POLICE OFFICER JANE DOE, POLICE OFFICER JULIO VASQUEZ, ELVIN MERA, POLICE OFFICER LISA ZEPPETELLI, POLICE OFFICER MICHAEL BONGIORNO, SERGEANT YAUDY FERNANDEZ,

*Defendants-Appellants.*

_____

Before:          KEARSE, BIANCO, and PÉREZ, *Circuit Judges.*

This is an interlocutory appeal from an order of the United States District Court for the Eastern District of New York (Frederic Block, *Judge*), entered on June 13, 2023, denying, on qualified immunity grounds, Defendants-Appellants New York City Police Department ("NYPD") Officers Arielle Gigante, Julio Vasquez, Elvin Mera, Lisa Zeppetelli, and Michael Bongiorno, and NYPD Sergeant Yaudy

Fernandez's (collectively, the "Officers") motion for summary judgment as to Plaintiff-Appellee Guo Hua Jin's false arrest claim brought pursuant to 42 U.S.C. § 1983. This claim arose from the Officers' arrest of Jin on April 13, 2019 after responding to a 911 call that reported an assault in progress in connection with a domestic violence dispute at an apartment in Flushing, New York. Following her arrest, Jin was charged with assault in the third degree and harassment in the second degree, in violation of New York Penal Law §§ 120.00-1 and 240.26-1, but the charges were subsequently dismissed. Jin then brought this action asserting claims for false arrest, malicious prosecution, malicious abuse of process, failure to intervene, conspiracy, violation of due process, and *Monell* liability, under Section 1983, as well as for violations of the New York State Constitution. The district court granted summary judgment in favor of the Officers on all the claims except Jin's false arrest claim under Section 1983 against the Officers. With respect to the false arrest claim, the district court determined that the Officers were not entitled to summary judgment on the basis of qualified immunity because there were disputed issues of material fact regarding whether there was probable cause to arrest Jin.

As a threshold matter, we conclude that, under the collateral order doctrine, we have jurisdiction over this interlocutory appeal insofar as we may review whether the Officers are legally entitled to qualified immunity when the facts in the record are construed most favorably to Jin. On the merits, we hold that the district court erred in denying qualified immunity to the Officers because the uncontroverted evidence in the record demonstrates that there was arguable probable cause to arrest Jin for assault and the disputed facts identified by the district court are immaterial to the arguable probable cause determination in this case. Moreover, the district court erred in suggesting that, in determining whether there is probable cause to make an arrest, police officers should conduct a more searching assessment of the credibility of individuals (including eyewitnesses) reporting incidents of domestic violence, as compared to reports of other types of criminal activity, because of the "relational dynamic" involved in domestic disputes. We emphasize that determinations of probable cause by police officers in connection with an alleged criminal act of domestic violence should be assessed on a case-by-case basis, in the same manner as any other alleged crime, and the mere fact that the witness supplying information to the police may have been involved in the domestic dispute does not in and of itself provide a basis to doubt the veracity of the witness. Here, the 911 call was corroborated (as captured on

2

police body-worn camera footage) by the putative victim demonstrating how Jin assaulted him and showing his injuries to the Officers once they arrived at the scene. Therefore, although the victim did not verbally describe the assault to the Officers, the totality of the evidence was sufficient to support arguable probable cause for Jin's arrest, notwithstanding her protestations of innocence. Thus, the Officers are entitled to qualified immunity for Jin's false arrest claim.

Judge Kearse dissents in a separate opinion.

> FOR DEFENDANTS-APPELLANTS: AMANDA ABATA, Assistant Corporation Counsel (Richard Dearing and Melanie T. West, Assistant Corporation Counsel, *on the brief*), *for* the Hon. Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, New York, New York.
>
> FOR PLAINTIFF-APPELLEE: MICHAEL R. CURRAN, Attorney-at-Law, Flushing, New York.

JOSEPH F. BIANCO, *Circuit Judge*:

This is an interlocutory appeal from an order of the United States District Court for the Eastern District of New York (Frederic Block, *Judge*), entered on June 13, 2023, denying, on qualified immunity grounds, Defendants-Appellants New York City Police Department ("NYPD") Officers Arielle Gigante, Julio Vasquez, Elvin Mera, Lisa Zeppetelli, and Michael Bongiorno, and NYPD Sergeant Yaudy Fernandez's (collectively, the "Officers") motion for summary judgment as to Plaintiff-Appellee Guo Hua Jin's false arrest claim brought pursuant to 42 U.S.C. § 1983. This claim arose from the Officers' arrest of Jin on April 13, 2019 after responding to a 911 call that reported an assault in progress in connection with a

domestic violence dispute at an apartment in Flushing, New York. Following her arrest, Jin was charged with assault in the third degree and harassment in the second degree, in violation of New York Penal Law §§ 120.00-1 and 240.26-1, but the charges were subsequently dismissed. Jin then brought this action asserting claims for false arrest, malicious prosecution, malicious abuse of process, failure to intervene, conspiracy, violation of due process, and *Monell* liability, under Section 1983, as well as for violations of the New York State Constitution. The district court granted summary judgment in favor of the Officers on all the claims except Jin's false arrest claim under Section 1983 against the Officers. With respect to the false arrest claim, the district court determined that the Officers were not entitled to summary judgment on the basis of qualified immunity because there were disputed issues of material fact regarding whether there was probable cause to arrest Jin.

As a threshold matter, we conclude that, under the collateral order doctrine, we have jurisdiction over this interlocutory appeal insofar as we may review whether the Officers are legally entitled to qualified immunity when the facts in the record are construed most favorably to Jin. On the merits, we hold that the district court erred in denying qualified immunity to the Officers because the

4

uncontroverted evidence in the record demonstrates that there was arguable probable cause to arrest Jin for assault and the disputed facts identified by the district court are immaterial to the arguable probable cause determination in this case. Moreover, the district court erred in suggesting that, in determining whether there is probable cause to make an arrest, police officers should conduct a more searching assessment of the credibility of individuals (including eyewitnesses) reporting incidents of domestic violence, as compared to reports of other types of criminal activity, because of the "relational dynamic" involved in domestic disputes. We emphasize that determinations of probable cause by police officers in connection with an alleged criminal act of domestic violence should be assessed on a case-by-case basis, in the same manner as any other alleged crime, and the mere fact that the witness supplying information to the police may have been involved in the domestic dispute does not in and of itself provide a basis to doubt the veracity of the witness. Here, the 911 call was corroborated (as captured on police body-worn camera footage) by the putative victim demonstrating how Jin assaulted him and showing his injuries to the Officers once they arrived at the scene. Therefore, although the victim did not verbally describe the assault to the Officers, the totality of the evidence was sufficient to support arguable probable

cause for Jin's arrest, notwithstanding her protestations of innocence. Thus, the Officers are entitled to qualified immunity for Jin's false arrest claim.

Accordingly, we **REVERSE** the district court's order denying the Officers' summary judgment motion with respect to the false arrest claim under Section 1983, and **REMAND** the case with instructions to the district court to grant summary judgment in favor of the Officers on the false arrest claim.

## BACKGROUND

### I. Facts

On the evening of April 13, 2019, the Officers responded to a 911 call made by a man reporting that Jin, who the caller identified as his brother's ex-wife, had entered an apartment in Flushing, New York, and struck his father with an umbrella. The father was subsequently identified as Xianjiu He ("Mr. He"). The police body-worn camera footage established that when the Officers arrived at the apartment, Mr. He's son answered the door and began speaking with the Officers. Mr. He quickly joined his son and the Officers at the door. The son then showed the Officers the injuries on his father's left arm and indicated that Jin caused the injuries by striking his father with an umbrella. While the son described his father's injuries, Mr. He stood beside him pointing to the injuries on his arm and

then, picking up an umbrella, simulated how Jin had struck him. Officer Vasquez subsequently photographed the lacerations and bruising on Mr. He's left arm.

While the Officers were still on the scene, Jin reappeared at the apartment and was immediately arrested. The police body-worn camera footage showed that, as Jin was being arrested, she repeatedly denied hitting Mr. He with an umbrella. Instead, Jin maintained that Mr. He and his wife beat her and threw her out of the apartment into the hallway. Jin told several of the Officers that the neighbors in an apartment next door could confirm her account of the events and repeatedly asked them to knock on the neighbors' door. The Officers never attempted to interview the neighbors. Jin also asserted that she was injured and asked Officers to look at her arms as she was being arrested, but any injuries were not visible to the Officers due to Jin's long-sleeve dress.

Jin was charged in a criminal complaint with assault in the third degree and harassment in the second degree, in violation of New York Penal Law §§ 120.00-1 and 240.26-1. The criminal complaint stated that Jin had engaged in a verbal dispute with Mr. He, and hit him on the arm with an umbrella, causing a "laceration . . . , substantial pain, [and] annoyance and alarm." Joint App'x at 211. Mr. He signed a deposition supporting the criminal complaint in which he swore

to the truth of the facts set forth therein. Jin was arraigned on April 14, 2019, and was released immediately thereafter. The charges were subsequently dismissed.

## II. Procedural History

On August 10, 2020, Jin brought the instant action, asserting claims for false arrest, malicious prosecution, malicious abuse of process, failure to intervene, conspiracy, violation of due process, and *Monell* liability, pursuant to Section 1983, as well as violations of the New York State Constitution. On February 21, 2023, the Officers moved for summary judgment, which the district court granted on June 13, 2023, as to all claims except Jin's Section 1983 false arrest claim against the Officers. *See generally Jin v. City of New York*, No. 20-cv-3603, 2023 WL 3984340 (E.D.N.Y. June 13, 2023).

In denying summary judgment on the false arrest claim, the district court concluded that there were disputed issues of fact regarding the probable cause determination that precluded summary judgment on the ground of qualified immunity. *Id*. at *3–4. For example, the district court noted that it was Mr. He's son—not Mr. He—who verbally relayed to the Officers what had transpired, and it was unclear whether his son witnessed the alleged assault at all. *Id*. at *3. The district court further explained that it was also unclear whether the 911 caller was

8

Mr. He's son or some other unknown witness. *Id*. Moreover, the district court concluded that, "[c]ommon sense dictates that the victim-perpetrator dynamic typical in many other crimes is not always as clear-cut in a domestic dispute incident," and thus, "even if [Mr. He's son] had been an eyewitness to the incident, there is no reason for the Officers to assume that he was an unbiased, credible source of information or translator, given the relational dynamic between him and his father and Jin." *Id*. at *4. Finally, the district court acknowledged that "an arresting officer is under no obligation to ferret out reasons to disbelieve a complaining witness," but then determined that, "since potentially unbiased third-party witnesses to the incident who could have confirmed either Jin's or [Mr. He's] account were available just next door, it cannot be said that a reasonable officer would not have sought to speak with them." *Id*.

In short, the district court concluded that "it is not clear that the undisputed facts as they are known to the Court support finding the Officers' probable cause determination was objectively reasonable," and therefore, "qualified immunity [did not] attach at this stage of litigation." *Id*.

This appeal followed.

9

**DISCUSSION**

On appeal, the Officers argue that the district court erred in concluding that they lacked arguable probable cause to arrest Jin and thereby denying their motion for summary judgment on qualified immunity grounds. We agree.

## I. Appellate Jurisdiction

As an initial matter, although not raised by the parties, we must analyze whether we have jurisdiction to hear this appeal. *See Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) (explaining that "federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press").

Because we may generally only hear appeals from "final decisions" of the district court, *see* 28 U.S.C. § 1291, interlocutory appeals may not be taken from denials of qualified immunity "[i]f resolution of the immunity defense depends upon disputed factual issues," *DiMarco v. Rome Hosp. & Murphy Mem'l Hosp.*, 952 F.2d 661, 665 (2d Cir. 1992). However, under the "collateral order doctrine," we may review on an interlocutory basis a denial of summary judgment based on qualified immunity if it may be resolved "on stipulated facts, or on the facts that

the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find." *Salim v. Proulx*, 93 F.3d 86, 90 (2d Cir. 1996). Thus, "even where the district court rules that material disputes of fact preclude summary judgment on qualified immunity, we may still exercise interlocutory jurisdiction if the defendant contests the existence of a dispute or the materiality thereof, or contends that he is entitled to qualified immunity even under plaintiff's version of the facts." *Cowan ex rel. Est. of Cooper v. Breen*, 352 F.3d 756, 761 (2d Cir. 2003) (alteration adopted) (internal quotation marks and citation omitted); *see also Poe v. Leonard*, 282 F.3d 123, 146 (2d Cir. 2002) ("[T]he legal inquiry necessitated by the defense of qualified immunity . . . requires that a court determine whether, under the plaintiff's version of the facts, reasonable officers in the defendant's position could disagree as to the legality of his actions.").

In the context of a false arrest claim, an arresting officer is entitled to qualified immunity, as a matter of law at the summary judgment stage, only "if the *undisputed facts* and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met." *McClellan v. Smith*, 439 F.3d 137, 147–48 (2d Cir. 2006) (emphasis in original) (internal quotation marks and citation omitted).

11

Here, the district court concluded, among other things, that the state of the Officers' knowledge as to whether Mr. He's son witnessed the altercation and whether Mr. He's son was the 911 caller were questions of fact for the jury, thereby making a grant of summary judgment based on qualified immunity inappropriate. However, the Officers contend that whether the son was present for the alleged attack and whether he was the 911 caller are immaterial to the qualified immunity analysis in this case because, even if those facts are resolved in plaintiff's favor (that is, he was not present for the alleged attack and was not the 911 caller), the Officers still have qualified immunity based upon the other uncontroverted facts established by the video evidence—namely, that the son described the assault to the Officers in the presence of the victim, while, consistent with the son's description, Mr. He demonstrated the attack and showed his injuries to the Officers. Therefore, because the Officers contend that qualified immunity may be decided based on facts independent of those identified by the district court as disputed, we have jurisdiction over this appeal. We review the district court's decision *de novo*. *See Terebesi v. Torreso*, 764 F.3d 217, 229 (2d Cir. 2014) ("Where factual disputes persist, we may exercise appellate jurisdiction only for the limited purpose of deciding whether, . . . on the facts the plaintiff alleges are true, or on

12

the facts favorable to the plaintiff that the trial judge concluded the jury might find, the immunity defense is established as a matter of law."(internal quotation marks and citation omitted)); *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir. 1995) ("[W]hether a disputed fact is material is a question of law and therefore, in the qualified immunity context, a finding of materiality is subject to prompt *de novo* review.").

## II.    Qualified Immunity Analysis

Under Section 1983, to establish a claim for false arrest, "a plaintiff must show that the defendant intentionally confined him without his consent and without justification." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks and citation omitted). There can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff because "probable cause to arrest constitutes justification." *Id.* "Probable cause exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (internal quotation marks and citation omitted). This includes circumstances when "a law enforcement officer

received information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity. The reliability or veracity of the informant and the basis for the informant's knowledge are two important factors." *Id*. (alteration adopted) (internal quotation marks and citation omitted).

Even if probable cause is determined not to have existed, an arresting officer is entitled to qualified immunity if there was arguable probable cause for the arrest, which exists when, "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991). In other words, in assessing arguable probable cause, the inquiry is "whether *any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that the challenged action was lawful." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (emphases in original).

Jin argues, *inter alia*, that the Officers cannot establish arguable probable cause for qualified immunity purposes because they failed to demonstrate that (1) they spoke to the alleged victim, Mr. He, directly about the incident, or (2) that

his son was an eyewitness to the incident. The dissent similarly finds that these issues of fact are critical to the qualified immunity analysis. *See post* at 12 ("The Officers had nothing from Mr. He—who was shown in the bodycam videos not speaking at all—to indicate that the scratch and bruise to which he pointed had been inflicted by Jin."); *id*. at 13 ("[T]he officers had only the word of the Son that the injuries exhibited by Mr. He had been inflicted by Jin. But there is no evidence that the Son claimed to have witnessed the altercation, or any evidence that the Officers even asked him whether he had been present."). Thus, according to the dissent, "[h]aving no statement from the victim or any person who witnessed the altercation, the Officers have pointed to no basis for a finding that they had an objectively reasonable belief that Mr. He's injuries were inflicted by Jin." *Id*. at 13; *see also id* at 12 (noting that these two factual issues need "to be resolved before their entitlement to such immunity can be determined"). We respectfully disagree.

Here, accepting the version of the facts most favorable to Jin—which includes Mr. He failing to verbally communicate with the Officers at the scene and his son not having been an eyewitness to the alleged assault or the 911 caller—we conclude that the Officers are entitled to qualified immunity because there was still arguable probable cause for Jin's arrest.

As we have emphasized, the probable cause determination is based on the "totality of the circumstances." *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (internal quotation marks and citation omitted). It follows then that "information gleaned from informants can be sufficient to justify the existence of probable cause . . . unless the circumstances raise doubt as to the person's veracity." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citations omitted); *see also Illinois v. Gates*, 462 U.S. 213, 242 (1983) ("[E]ven in making a warrantless arrest[,] an officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." (internal quotation marks and citation omitted)). In other words, the "reasonably trustworthy information" establishing probable cause need not come from an eyewitness. *Betts*, 751 F.3d at 82. Indeed, "we have endorsed the proposition that an identified citizen informant is presumed to be reliable." *Panetta*, 460 F.3d at 395 (internal quotation marks and citation omitted); *see also Easton v. City of Boulder*, 776 F.2d 1441, 1449 (10th Cir. 1985) (noting that "the skepticism and careful scrutiny usually found in cases involving informants,

sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an identified victim or *ordinary citizen witness*" (emphasis added)).

Therefore, even assuming—most favorably to Jin—that the son was not present for the incident and was not the 911 caller, and was merely an informant recounting the incident as described to him by his father prior to the Officers' arrival, the son's statements to the Officers, and the corroborating evidence of Mr. He physically demonstrating the attack and showing the Officers his injuries would establish at least arguable probable cause to arrest Jin under the totality of the circumstances. In other words, even under Jin's version of the disputed facts, reasonable officers could disagree as to whether there was probable cause to arrest based upon the reasonably trustworthy information relayed to the Officers by Mr. He's son, which was simultaneously corroborated by Mr. He demonstrating the attack and displaying his injuries. *See also Peng v Mei Chin Penghu*, 335 F.3d 970, 977–78 (9th Cir. 2003) (holding, in a domestic violence situation, that "[t]he undisputed evidence . . . establishes that the family members were upset and angry, and given the language barriers between [the officer] and the witnesses, we are satisfied that [the officer] had probable cause to arrest [plaintiff]); *Roberts by Roberts v. City of New York*, 753 F. Supp. 480, 485 (S.D.N.Y. 1990) (holding that police

17

officers were entitled to qualified immunity because probable cause was not completely lacking even when the arrest was based only on statements relayed by a translator to the police on behalf of the victim). In short, the Officers are entitled to qualified immunity based on the arguable probable cause established by the son's corroborated statements, regardless of whether the son was the 911 caller or present for the assault.

In any event, even assuming *arguendo* that the police were not entitled to rely upon any portion of the son's explanation of the assault at the scene, we conclude that the other undisputed facts from this record were sufficient to establish at least arguable probable cause for the arrest. Specifically, it is undisputed that the 911 call report referenced that an umbrella was used in the assault by the ex-wife of the caller's brother, and the Officers later observed an umbrella inside the apartment. Moreover, as noted above, it is also uncontroverted (based on the police body-worn camera footage) that, as the son was speaking, Mr. He demonstrated the act of someone hitting him with the umbrella for the Officers, and that Mr. He also showed the Officers the resulting injuries on his arm. These facts—visible injuries, coupled with the presence of the alleged weapon and a demonstration of the alleged assault that matched the

18

description in the 911 call report—sufficiently demonstrate arguable probable cause, even without the son's explanation. *See Brown v. City of New York*, 798 F.3d 94, 99–100 (2d Cir. 2015) (concluding that officers were entitled to qualified immunity where on-scene information collected by the officers, combined with the 911 call information, made it "objectively reasonable for the officers to believe probable cause existed" (internal quotation marks and citation omitted)).

Separately, the Officers assert that the district court erred in denying summary judgment to the extent the decision was informed by a view that "the context of a domestic dispute" might "render witness statements less reliable, necessitating further investigation." Appellants' Br. at 16. On this point, the district court acknowledged that the facts known to the Officers in the instant case may have been sufficient to establish probable cause in a scenario not involving domestic violence:

> To determine if the Officers had arguable probable cause to arrest Jin, the Court must assess the facts known to the Officers at the time of her arrest. These facts were: (i) that a 911 call had been placed to report a domestic incident, (ii) the account relayed by [Mr. He's] son of Jin hitting his father with an umbrella, and (iii) the scratch visible on [Mr. He's] arm. Had these facts occurred under differing circumstances, a probable cause determination may have been more certain. However, the facts must be considered in their context—a purported domestic violence incident.

*Jin*, 2023 WL 3984340, at *3.

The district court then further suggested that the well-established rule that allows for police officers to rely upon the statement of a putative victim or eyewitness to establish probable cause "unless the circumstances raise doubt as to the person's veracity," *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001), has a special application in domestic violence situations because statements to police in that context are, according to the district court, inherently less reliable:

> [E]ven if [Mr. He's son] had been an eyewitness to the incident, there is no reason for the Officers to assume that he was an unbiased, credible source of information or translator, given the relational dynamic between him and his father and Jin. Common sense dictates that the victim-perpetrator dynamic typical in many other crimes is not always as clear-cut in a domestic dispute incident. And, since Jin contradicted [Mr. He's son's] account and claimed herself to be the victim in the incident, the Officers had further reason to potentially discredit the son's account.

*Jin*, 2023 WL 3984340, at *4.

We conclude that the district court erred insofar as it suggested that police should assess the credibility of a victim, eyewitness, or other witness reporting an alleged domestic violence incident differently than reports of other criminal activity because of the inherent "relational dynamic[s]" of alleged domestic disputes. *Id.* We reiterate that domestic violence complaints present "extraordinarily difficult judgment decisions that law enforcement officers must

20

make," *Lee v. Sandberg*, 136 F.3d 94, 104 (2d Cir. 1997), and police officers should not discount the veracity or reliability of a witness's statement merely because that statement was provided in the context of an alleged domestic dispute where there may be an acrimonious history between the parties, *see, e.g.*, *Kanderskaya v. City of New York*, 590 F. App'x 112, 114 (2d Cir. 2015) (summary order) ("That [the plaintiff] and her husband were experiencing marital discord did not require the officers to discount her husband's account, nor did [the plaintiff's] protestations of innocence."); *see also Schnitter v. City of Rochester*, 556 F. App'x. 5, 8 (2d Cir. 2014) (summary order) ("While the complaint alleges that [the plaintiff's] wife had various attributes that made her an unreliable witness, it alleges no facts suggesting that [the investigator] either knew or should have known of those attributes, or of any other material reason to doubt the veracity of [the plaintiff's] wife's testimony, prior to the arrest."). In other words, the mere fact that a victim, eyewitness, or informant is reporting criminal activity arising from a domestic dispute does not, by itself, raise a doubt as to the witness's veracity sufficient to undermine the presumption of reliability that officers are permitted to attach to such witnesses. *See Panetta*, 460 F.3d at 395.

Indeed, as we have noted, in some circumstances, an acrimonious history in a relationship could provide strong evidence of motive in connection with an act of domestic violence that buttresses the credibility of a victim or another witness reporting such violence to the police. *See, e.g.*, *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006) (explaining that a contentious history between the plaintiff and complaining victim was evidence supporting probable cause, not a reason to doubt the complaining victim); *Williams v. City of New York*, 683 F. App'x 57, 59 (2d Cir. 2017) (summary order) ("[E]ven assuming the arresting officers were aware of the bitter relationship between Appellant and [the complaining victim], information indicating a history of animosity between Appellant and [the complaining victim] supplied evidence of motive supporting the existence of probable cause." (alteration adopted) (internal quotation marks and citation omitted)).

In defending the district court's analysis, the dissent notes that, "[i]n all kinds of cases, there may be 'doubt as to an informant's motives,' and regardless of what conclusion may be suggested, it makes sense for reasonable law enforcement officers to at least consider whether the person providing them with information may have a personal interest in having the person accused arrested."

*Post* at 10–11 (internal citation omitted) (quoting *Gates*, 462 U.S. at 234). And the dissent emphasizes that "[f]amily-type relationships, whether smooth or troubled, engender emotions that may affect a reporting family member's perception, memory, or veracity." *Id*. at 11. We agree. However, notwithstanding these realities of family life, police officers should not, as the district court suggested, doubt a report of an assault by a victim or other witness simply because the report is made in the context of a domestic incident and the alleged abuser denies the assault.[1] Instead, as with the probable cause determination for any other alleged criminal activity, the credibility of a witness, and the impact of any animosity the witness may have against the suspect, must be assessed on a case-by-case basis in light of all of the facts and circumstances available to the police officer at the time of arrest. *See Caldarola*, 298 F.3d at 162 ("In looking to the totality of the circumstances, courts must be aware that 'probable cause is a fluid concept— turning on the assessment of probabilities in particular factual contexts—not

---

[1] Contrary to dissent's contention, the district court, in making this broad and unqualified pronouncement about the impact of family relationships on credibility, did not point to anything fact-specific about this case. Nor is there any evidence in the record regarding the particular family relationships here that would have required the Officers to discredit the son's statement (as corroborated by the victim's physical demonstration of the assault and display of the injuries).

23

readily, or even usefully, reduced to a neat set of legal rules.'" (quoting *Gates*, 462 U.S. at 232)).

Other courts have similarly emphasized that the fact that a crime is reported to the police in the context of a domestic violence incident does not raise inherent doubts about the credibility of the victims or other familial witnesses reporting information to the police regarding that incident. *See, e.g.*, *United States v. Patane*, 304 F.3d 1013, 1016–17 (10th Cir. 2002) ("We reject any suggestion that victims of domestic violence are unreliable witnesses whose testimony cannot establish probable cause absent independent corroboration. . . . We find no basis for the suggestion that domestic violence victims are undeserving of the presumption of veracity accorded other victim-witnesses."), *rev'd on other grounds*, 542 U.S. 630 (2004); *Turner v. Mele*, No. 15-cv-74 (NG) (SJB), 2017 WL 4484193, at *2 (S.D.N.Y. Oct. 5, 2017) ("While a prior relationship between the victim and the accused may give rise to a motive for a false accusation, '[o]ftentimes, the only eyewitnesses to domestic violence are the assailant and his or her victims. If police were obligated to discredit a victim's account of the events solely because of acrimonious history between the parties, these violent crimes would go virtually unprosecuted.'" (quoting *Romney v. Black*, No. 14-cv-4512 (JMA) (SIL), 2017 WL 1317011, at *7

(E.D.N.Y. Mar. 31, 2017))); *Rheingold v. Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 390 (S.D.N.Y. 2008) (concluding that "[the officer] could rely on [the ex-wife's] complaint because he had no reason at the time to doubt the veracity of her statement that plaintiff violated [an] order" issued by a Family Court, establishing a parental visitation schedule).

We also conclude, for the same reasons, that the district court erred in suggesting that Jin's protestation of innocence during her arrest, and her accompanying claim that the neighbors would corroborate her version of the facts, gave the Officers "further reason to potentially discredit the son's account" and required that the Officers, before making an arrest, interview these other potential witnesses in the building. *Jin*, 2023 WL 3984340, at *4; *see id*. ("[S]ince potentially unbiased third-party witnesses to the incident who could have confirmed either Jin's or [Mr. He's] account were available just next door, it cannot be said that a reasonable officer would not have sought to speak with them.").

We have emphasized that "an officer may not disregard plainly exculpatory evidence," but "the fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause, and an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause."

*Panetta*, 460 F.3d at 395–96 (alteration adopted) (internal quotation marks and citation omitted). For example, in *Curley*, we held that, when an alleged victim of assault told police that the plaintiff was the perpetrator, police had probable cause to arrest, even though the plaintiff offered a conflicting account. 268 F.3d at 70. In doing so, we explained:

> [O]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest. Although a better procedure may [be] for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him. Nor does it matter that an investigation might have cast doubt upon the basis for the arrest. Before making an arrest, if the arresting officer has probable cause, he need not also believe with certainty that the arrestee will be successfully prosecuted.

*Id*. (internal quotation marks and citations omitted); *see also Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989) ("Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence.").

To hold otherwise would substantially hamper the ability of police officers, especially when responding to a 911 call, to quickly diffuse a volatile situation and protect domestic violence victims from harm by making an arrest based on the

statement of the victim or another witness. Such victims would potentially remain vulnerable to violence while this new legal rule required police officers to conduct additional investigation to corroborate the account of domestic abuse. Indeed, New York law states that "a police officer shall arrest a person, and shall not attempt to reconcile the parties or mediate, where such officer has reasonable cause to believe" that "a misdemeanor constituting a family offense . . . has been committed by such person against such family or household member, unless the victim requests otherwise." N.Y. Crim. Proc. Law § 140.10(4)(c); *see Betts v. Shearman*, No. 12-cv-3195 (JPO), 2013 WL 311124, at *8 (S.D.N.Y. Jan. 24, 2013) (noting that "[t]his statute . . . reflects the legislature's attempt to eliminate indifference by law enforcement agencies when responding to reports of domestic violence and to prevent further injury to victims of family violence." (internal quotation marks and citation omitted)), *aff'd*, 751 F.3d 78 (2d Cir. 2014).

Thus, here, even assuming *arguendo* that it may have been a better practice in this particular situation for the Officers to knock on the neighbors' door to attempt to obtain additional information about the alleged incident before making a determination regarding the arrest, they did not violate clearly established law in failing to do so. *See, e.g., Lee*, 136 F.3d at 104 (holding that the officers were

entitled to qualified immunity where they arrested the plaintiff based on his wife's claim that he karate-chopped her arm despite the officer not seeing any signs of physical assault such as bruising or swelling); *see also Myers v. Patterson*, 819 F.3d 625, 633 (2d Cir. 2016) ("The doctrine of qualified immunity serves to protect police from liability and suit when they are required to make on-the-spot judgments in tense circumstances and when their actions could reasonably be seen as lawful." (internal quotation marks and citation omitted)); *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995) ("[I]n order to assess whether [the police officers] are entitled to immunity on [plaintiff's] Fourth Amendment unlawful arrest claim, the district court should have focused on the information the officers had available to them, not on whether the information resulted from exemplary police work.").

In sum, based upon the information available to the Officers—including the 911 call, as well as the victim physically demonstrating the attack and showing his injuries while his son recounted the assault to the Officers—arguable probable cause existed for Jin's arrest regardless of the disputed facts regarding whether the son was the 911 caller or witnessed the alleged assault. Accordingly, the district court erred in denying qualified immunity to the Officers.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's order denying the Officers' summary judgment motion with respect to the false arrest claim under Section 1983, and **REMAND** the case with instructions to the district court to grant summary judgment in favor of the Officers on the false arrest claim.

*Jin v.*
*City of New York*,
No. 23-1019

KEARSE, *Circuit Judge*, dissenting.

I respectfully dissent. The existence of probable cause to arrest depends on what the arresting officers knew at the time of the arrest. The officers' assertion of the affirmative defense of arguable probable cause does not allow--or require, as the majority would have it--the court to ignore the state of their knowledge or the lack thereof.

"Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

> "Probable cause existed if *'at the moment the arrest was made . . .* the facts and circumstances *within the [officers'] knowledge* and of which they *had reasonably trustworthy information* were sufficient to warrant a prudent man in believing' that [the suspect] had violated" the law, *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) . . . .

*Zellner v. Summerlin*, 494 F.3d 344, 370 (2d Cir. 2007) ("*Zellner*") (emphases in *Zellner*). The affirmative defense of arguable probable cause cannot require the court to disregard the state of their knowledge:

> [A]n officer sued under the Fourth Amendment for false arrest is

"entitled to immunity if a *reasonable* officer *could have believed* that probable cause existed," *Hunter*, 502 U.S. at 228 . . . . *Accordingly, like the probable cause analysis, the analysis of a qualified immunity defense to claims that official actions were taken without probable cause entails an inquiry into the facts known to the officer at the time of the arrest . . . .*

*Zellner*, 494 F.3d at 370 (other internal quotation marks omitted) (emphases mine).

Thus, "[a] court must evaluate the objective reasonableness of the appellants' conduct 'in light of . . . *the information the . . . officers possessed*.'" *Id*. (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (other internal quotation marks omitted) (emphasis mine).)

The majority in this case holds that the defendants--five police officers and their supervisor Sergeant Yaudy Fernandez (collectively the "Officers")--are entitled, as a matter of law, to qualified immunity from the plaintiff Jin's claim of false arrest, on the basis of arguable probable cause to arrest her for assault. The majority so holds despite a record that--when taken in the light most favorable to Jin--permits inferences (a) that the Officers had obtained neither a statement by the alleged victim of assault, Jin's former father-in-law ("Mr. He"), that he was assaulted by Jin, nor a statement from any eyewitness that Mr. He was assaulted by Jin, and (b) that the Officers relied solely on the statements of Jin's former brother-in-law, Mr. He's son

2

("the Son"), who had not been present at the event and who stated his interest in having Jin arrested so that she would stop "bother[ing]" his parents.

There is no dispute that on April 13, 2019, there was an altercation between Jin and Mr. He, and that the Officers responded to a 911 call from the Son, stating that his father was being assaulted. But we are confronted with a record in which Mr. He, the alleged victim, did not speak English; the Officers did not call in an interpreter; none of the videos from the Officers' body-worn cameras ("BWCs" or "bodycams") show Mr. He himself speaking at all (in any language); and in those videos, the only person who stated that Mr. He had been assaulted by Jin was Jin's former brother-in-law, the Son, who--the record indicates--did not witness the altercation.

As the district court described the Officers' communications with Mr. He and the Son,

> [u]pon the Officers' arrival at the apartment, [Mr. He's] [S]on answered the door and began speaking with them. As is apparent from the BWC footage, *[Mr. He] did not speak to the Officers, since he apparently does not speak English.*

*Jin v. City of New York*, No. 20-CV-3603, 2023 WL 3984340, at *1 (E.D.N.Y. June 13, 2023) ("*Jin I*") (emphasis added). The district court noted that "[t]he Officers did not

3

call a translator," and that they "instead relied on [Mr. He's] [S]on, who Officers appear to assume was the 911-caller." *Id.*

Perhaps the Officers asked the Son, when he answered the door, whether he was the 911 caller; but what was asked or said is not in the record because at the outset the Officers' bodycams were muted. As the district court noted,

> [t]he *audio* in the BWC footage *commences* when [Mr. He] approaches the Officers and points to an area on the inside of his arm near his elbow crease. A scratch is visible and one of the Officers asks him "*Who did that*?" *The [S]on responds* that it was his brother's ex-wife, <u>Jin</u>, and [Mr. He] picks up an umbrella and pantomimes hitting his arm with the object. *The [S]on tells the Officers something to the effect of, "I just want to write down a report to just let her . . . don't bother my father, my parents anymore*" . . . .

*Id.* (emphases added). The district court noted that "Sergeant Fernandez respond[ed], '[Well] she's going to get arrested.' This occurs at approximately minute 1:02 of the video and *less than a minute into the Officers' interaction with [Mr. He] and his [S]on*." *Id.* (emphasis added).

In his deposition, Fernandez was asked about his instant announcement that Jin would be arrested, and he testified, "I saw someone with an injury, and *they* were able to tell me who the person who caused that injury was. So I believe that's enough." (A.368 (Deposition of Yaudy Fernandez ("Fern. Dep."), at 146) (emphasis

4

added).)  When Fernandez was asked who the "they" were "[w]ho told him that a certain person injured" Mr. He, Fernandez referred to the bodycam video, and answered that the Son "said" the injury "was caused by . . . his brother's ex-wife." (*Id.*)

But Fernandez testified that his statement had not meant that Jin should immediately be arrested.  He denied that the early 2½ minutes shown on the bodycam videos showed "the entire investigation," saying that "wasn't . . . the end of the investigation."  (A.386-87 (Fern. Dep. 168-69).)  Although Fernandez initially denied that the Son's assertions that Jin had hit his father had precipitated Fernandez's decision that Jin should be arrested--saying that "[t]he injuries speak for themselves" (A.392 (Fern. Dep. 174))--when he was asked the narrower question of whether he could have arrested Jin without the Son's saying that Jin "made th[e] injuries" to "his father's arm," Fernandez testified that he could not have ordered the arrest "without [his] knowing where those injuries came from."  (A.399 (Fern. Dep. 181).)

Fernandez testified that Officer Gigante was assigned to arrest Jin (*see* A.396 (Fern. Dep. 178); *see also* A.403 (Deposition of Arielle Gigante ("Gig. Dep."), at 18)), and that he "would assume" that Gigante continued the investigation (A.387 (Fern. Dep. 169)).  However, no such continued investigation prior to Jin's arrest

5

appears in the record.

The two overlapping bodycam videos showing the Officers' arrival at Mr. He's apartment--and the start of their communication with Mr. He and the Son--lasted less than 2½ minutes, covering about 9:28 p.m. through 9:31 p.m. The next bodycam video began at 9:39 p.m., lasted only 50 seconds, and only showed Officer Vasquez taking pictures of Mr. He's arm. There is thus no bodycam video in the record for some seven minutes; and there is no affidavit or testimony by defendants as to what occurred or was said in that interval.

The only additional bodycam video in the record--proffered by Jin, not by defendants--began at 9:41 p.m., and it shows Jin telling the officers that she did not attack Mr. He, that Mr. He and his wife had hit and kicked her, and that Mr. He's neighbors in the adjacent apartment had witnessed the altercation. It shows Jin attempting to get the Officers to look at her arms and legs where she said Mr. He and his wife had injured her, and Jin urging the Officers to ask the neighbors what they had witnessed. As the district court described it,

> Jin, who was waiting in a stairwell near the apartment when the Officers arrived, apparently approached them at some point when they were speaking with [Mr. He's] [S]on. [A] BWC video shows Jin's subsequent arrest. *In the footage, she is heard telling Officers that she was hit*. When *the Officers do not respond*, she

6

continues in broken English, "The next door, they saw me, two of them, people . . . next door, *can you ask them*? . . . ." Officer Gigante responds, "Not right now, just wait."

*Jin I*, 2023 WL 3984340, at \*2 (emphases added).

Although Fernandez, as indicated above, testified that he (the supervisor) had assumed there would be further investigation prior to any arrest of Jin, defendants have not described, or proffered any record of, such an investigation. And the district court noted that in the final bodycam video--after Jin had told the Officers that she did not assault Mr. He, and that instead she was assaulted by Mr. He and his wife, and had unsuccessfully tried to get the Officers to look at her injured arms and legs--when Jin urges "that the people next door" who "witnessed the incident" be asked what they saw, Fernandez responds, "*It doesn't matter*. You're under arrest." Id. at \*2 (emphasis added).

While defendants in their Rule 56.1 Statement in support of summary judgment asserted (see A.153) that "*[t]he complaining victim spoke to the officers* and showed them bruises and a laceration on his arm" (*id*. ¶ 5 (emphasis added)), that "*Officer Gigante interviewed the complaining victim*" (*id*. ¶ 6 (emphasis added)), and that "*[t]he complaining victim told Officer Gigante* that plaintiff hit him with an umbrella" (*id*. ¶ 7 (emphasis added)), in fact none of the Officers' bodycam videos show Mr. He

7

speaking at all. And although Gigante testified that when she interviewed Mr. He, which was after Jin had been arrested (*see* A.182-84 (Gig. Dep. 36-38)), "[Mr. He] told [her]"--in Chinese--"that the defendant [*sic*] did that to him" (A.186 (Gig. Dep. 40); *see also* A.190 (Gig. Dep. at 44) ("[Mr. He] stated that the defendant [*sic*] did it")), Gigante testified that there was no video of the interview (*see, e.g.,* A.182-84 (Gig. Dep. 36-38)).

Perhaps in the seven-minute interval as to which the record is bare--or in the muted portion of the initial bodycam videos when the Son answered the door--the Officers were told by the Son that he had witnessed the altercation at Mr. He's apartment. But such possibilities are entirely speculative, because defendants, who have the burden of proof as to the facts that would entitle them to qualified immunity, submitted no affidavits or deposition testimony stating that at any point they were told that the Son was present at the altercation. Nor is there any evidence in the record that any of the Officers even asked the Son the rather routine law-enforcement question of whether the Son had actually seen the incident he described. Indeed, the record as a whole clearly suggests that the Son was not an eyewitness.

The district court duly inferred that the Officers believed the Son was the 911 caller: The Rule 56.1 Statement submitted by defendants, setting out material

facts that they asserted were undisputed, stated that "[t]he 911 caller answered the door." (A.153, ¶ 3; *see also* A.192 (Gig. Dep. 51) (Gigante was responding to "a 911 call," and "[t]he [S]on was the caller"); A.417 (Gig. Dep. 32) ("the [S]on was actually the caller").) That may well be; but according to the police department's "Event Chronology" of the 911 call on April 13, 2019, reporting an "ASSAULT (IN PROGRESS)" at "140-16 34[th] AVE . . . 406:4FLR"--*i.e.*, at Mr. He's apartment--the "*Caller['s]*" "*Location[ was] 31-70 138TH ST*." (A.439 (emphasis added).) Thus, on this motion by defendants for summary judgment in their favor, it must be inferred that the Son--the 911 caller--was not at Mr. He's apartment at the time that the altercation was "IN PROGRESS."

The district court further observed that, even if, contrary to the 911 caller records,

> [Mr. He's Son] had been an eyewitness to the incident, *there is no reason for the Officers to assume that he was an unbiased, credible source of information or translator, given the relational dynamic between him and his father and Jin. Common sense dictates that the victim-perpetrator dynamic typical in many other crimes is not always as clear-cut in a domestic dispute incident.* And, since Jin contradicted [Mr. He's] [S]on's account and claimed herself to be the victim in the incident, the Officers had further reason to *potentially* discredit the son's account.

*Jin I*, 2023 WL 3984340, at *4 (emphases added). Contrary to the majority's view that

9

this observation by the district court constituted a break with precedent by suggesting a special rule for claims of domestic violence (*see* Majority Opinion *ante* at 24-25), the probable cause standard is based on just such common sense as the district court indicated. Probable cause

> does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, *practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same--and so are law enforcement officers*.

*Illinois v. Gates*, 462 U.S. 213, 231-32 (1983) (internal quotation marks omitted) (emphasis mine). The district court's iteration of gaps in the record as to the Officers' knowledge and investigation as bearing on arguable probable cause is entirely consistent with the probable cause standard, with the court's duty to view the record as a whole, and with the common-sense understanding that information given by an informant who has not witnessed the events he describes, and who has evinced a non-law-enforcement interest in precipitating an arrest, may not be trustworthy and warrants further scrutiny.

In all kinds of cases, there may be "doubt as to an informant's motives," *Gates*, 462 U.S. at 234; and regardless of what conclusion may be suggested, it makes sense for reasonable law enforcement officers to at least consider whether the person

10

providing them with information may have a personal interest in having the person accused arrested. Family-type relationships, whether smooth or troubled, engender emotions that may affect a reporting family member's perception, memory, or veracity. In *Cartier v. Lussier*, 955 F.2d 841 (2d Cir. 1992), for example, we noted the relevance of potential witnesses' interest--or disinterest--in fathoming probable cause to arrest Cartier on a charge of negligent homicide in connection with an automobile accident. Cartier, her mother, and her brother all stated that Cartier was not driving at the time of the accident. We stated that those "*three are all interested to some extent,*" and that "[n]one of the[ir] statements [wa]s entitled to as much credibility as that made by . . . the driver of the other vehicle," who was "the only disinterested witness who actually saw the accident unfold." *Id*. at 846 (emphasis added).

The district court here noted that "although an arresting officer is under no obligation to ferret out reasons to disbelieve a complaining witness, . . . it is not clear that when presented with significant reasons to potentially discredit that witness, they may simply ignore them." *Jin I*, 2023 WL 3984340, at *4. And in this case in particular, when "potentially unbiased third-party witnesses to the incident who could have confirmed either Jin's or [Mr. He's] account were available just next door, *it cannot be said that a reasonable officer would not have sought to speak with them.*"

11

*Id*. (emphasis added).

The district court did not rule that as a matter of law defendants are not entitled to qualified immunity based on arguable probable cause; rather, it ruled that there are genuine issues of material fact to be resolved before their entitlement to such immunity can be determined. This was especially appropriate given that their entitlement to such immunity depends on what facts the Officers knew at the time of Jin's arrest; that Fernandez acknowledged that the Officers could not properly arrest Jin "without . . . knowing" that "th[e] injuries came from" Jin (*see* A.399 (Fern. Dep. 181)); and that while the Officers argue that they are entitled to rely on statements by victims and witnesses, the record shows that any information the Officers were given that Mr. He's injuries were inflicted by Jin was nonexistent from Mr. He and was questionable coming from the Son.

The Officers had nothing from Mr. He--who was shown in the bodycam videos not speaking at all--to indicate that the scratch and bruise to which he pointed had been inflicted by Jin. Although Mr. He did not speak English, he surely knew the name "Jin": Until six months before this incident, she had been his daughter-in-law for nearly eight years. And yet neither when the Son pointed at the scratch on Mr. He's arm and the Officers asked "[w]ho did that," nor when Mr. He himself

motioned toward his arm, did he say the name "Jin." He said nothing.

Instead, the Officers had only the word of the Son that the injuries exhibited by Mr. He had been inflicted by Jin. But there is no evidence that the Son claimed to have witnessed the altercation, or any evidence that the Officers even asked him whether he had been present. And the police department's 911 call records described above indicate that the Son--who defendants insist was the 911 caller--did not witness the reported assault, given that the 911 call records show that the "ASSAULT (IN PROGRESS)" report came from a location other than Mr. He's address. Having no statement from the victim or any person who witnessed the altercation, the Officers have pointed to no basis for a finding that they had an objectively reasonable belief that Mr. He's injuries were inflicted by Jin.

Further, the district court noted that the Son had revealed to the Officers an interest in having Jin arrested, independent of whether she had assaulted Mr. He. The court referred to the initial bodycam 2½-minute videos, in which "[t]he [S]on tells the Officers something to the effect of, '*I just want to write down a report to just let her . . . don't bother my father, my parents anymore.*'" *Jin I*, 2023 WL 3984340, at *1 (emphasis added). Both the Son's explicit revelation of his interest in preventing Jin from "bother[ing]" his parents and the fact that he likely was not present at the incident in

13

which he--and only he--told the Officers that Mr. He was assaulted by Jin, begged for further investigation. And Fernandez, in his deposition, indicated as much.

But there is nothing in the record to show that the Officers requested or received any additional information before arresting Jin. After the initial 2½ minutes, the Officers turned off their bodycams and left them turned off for the next seven minutes. Defendants have proffered nothing in the record to show what they were told in that interval--an information blackout that began at a point that "wasn't . . . the end of the investigation" (A.387 (Fern. Dep. 169)) and ended with Fernandez telling Jin that whatever the eyewitness neighbors might say "doesn't matter."

As the Supreme Court noted in *Gates*, "the totality-of-the-circumstances analysis . . . traditionally has informed probable cause determinations." 462 U.S. at 238. And as the Court has explained several times,

> "reasonable suspicion" and "probable cause" . . . . are commonsense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men . . . act.

*Ornelas v. United States*, 517 U.S. 690, 695 (1996) (other internal quotation marks omitted). Given the totality of the circumstances here, with the gaps in the record that include silence as to what information the Officers received in the unrecorded seven-

14

minute period that began before the Officers' investigation had ended and that concluded with Jin's arrest, I see no error of law in the district court's denial of defendants' motion for summary judgment dismissing Jin's false arrest claim. The court reached a common-sense conclusion that, on the present record, the Officers--given their reliance on only the representations of an interested person who was not present at the event he described, their insistence that they relied on statements by the alleged victim of assault who never spoke a word or a name in any of the bodycam videos, and their refusal even to inquire of nearby disinterested neighbors who were said to have witnessed the event--were not entitled to prevail as a matter of law based on their affirmative defense of arguable probable cause to arrest Jin. Given the gaps in this record and the choices made by the Officers, I cannot see that the district court erred in concluding that there are material issues of fact for a jury to decide.

And because the district court made no error of law and reasonably found that there were genuine issues of material fact to be resolved, its decision does not fall within the class of decisions as to qualified immunity that may properly be appealed immediately. *See*, *e.g.*, *Johnson v. Jones*, 515 U.S. 304, 313, 317-18 (1995). I would dismiss this appeal for lack of appellate jurisdiction.